UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

UNITED STATES OF AMERICA

- against -

VON TUCKER,

                              Defendant.

------------------------------------------------------- X

**MEMORANDUM**
**OPINION AND ORDER**

**S5 05 Cr. 711 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

       Defendant Von Tucker was convicted of certain narcotics offenses and of murder. He now moves to set aside the verdict. For the following reasons, this motion is denied.

**II.   BACKGROUND**

    **A.    Facts**[1]

       From 2004 to 2005, Shedret Whitehead and Ronald Allen maintained

---

[1]    Because Tucker has been convicted at trial and now challenges the sufficiency of the evidence, the facts presented here are those adduced at trial, viewed "in the light most favorable to the Government, drawing all permissible inferences in the [G]overnment's favor." *United States v. Friedman*, 300 F.3d 111, 123 (2d Cir. 2002).

1

a crack cocaine distribution organization at 3355 Seymour Avenue in the Bronx.[2] Tucker, Jameek Rich, and Jadrien Smith served as "enforcers," providing security and ensuring that rival drug dealers did not encroach on the organization's territory. Nathaniel Jones ("Jones"), Dana Curry, and Beatrice Jones ("B. Jones") were the principal retail distributors of the crack cocaine, and two prostitutes who lived in the area were tangentially involved in the organization, sometimes transporting or selling crack cocaine.[3]

On May 6, 2005, Kenneth Scott knocked on the door of B. Jones's apartment. B. Jones and Curry were in the apartment at the time. Scott was familiar to B. Jones because he formerly sold crack cocaine for her and for Curry.[4] Scott revealed a firearm and demanded all of the crack cocaine and money in the apartment; B. Jones and Curry gave Scott the crack cocaine, but told him that no money was in the apartment.[5] They then told Whitehead that they had been robbed of both the crack cocaine and the money, and kept the money for themselves.

---

[2] *See* Trial Transcript ("Tr.") at 451-455 (testimony of Curry).

[3] *See id.* at 133-146 (testimony of Jones); *id.* at 454-455 (testimony of Curry).

[4] *See id.* at 485-488 (testimony of Curry).

[5] *See id.* at 486 (testimony of Curry).

2

Whitehead, Tucker, Allen, Rich, and Smith gathered to discuss the robbery.[6] Whitehead stated that they were "going to get that punk," meaning Scott.[7] Allen left the meeting and returned with a black handgun. Whitehead stated, "We going to kill this guy. We going to kill him."[8] Tucker volunteered to murder Scott, and left the meeting with the handgun in the front pocket of his sweatshirt.[9]

On the morning of May 8, 2005, Ken Matthew and Shawn, local marijuana dealers, were in the stairway of Shawn's building overlooking Wilson Avenue.[10] Whitehead and Tucker arrived in a tan Astro van. Tucker purchased marijuana from Shawn, and Matthew heard Tucker tell Shawn, "don't stand next to him, he's going down."[11]

Later that day, Tucker and Whitehead returned to 3355 Seymour Avenue with information as to the location of Scott. They then drove away, with

---

[6] *See id.* at 174-175 (testimony of Jones).

[7] *Id.* at 176 (testimony of Jones).

[8] *Id.* at 178 (testimony of Jones).

[9] *See id.* at 178-179 (testimony of Jones).

[10] *See id.* at 656 (testimony of Matthew).

[11] *Id.* at 658 (testimony of Matthew).

Whitehead driving and Tucker in the passenger seat.[12]

Approximately twenty minutes later, Matthew observed Tucker and Whitehead leaning against a fence looking up Hicks Street in the direction of Seymour Avenue. They crossed Hicks Street, then ran in the direction of Seymour Avenue.[13] Shortly thereafter, at the corner of Hicks Street and Seymour Avenue, a van pulled up next to Scott and an individual in the van fired at least thirteen shots from a nine millimeter caliber handgun.[14] Scott died from injuries caused by these shots.

The van then fled the area. Tucker returned to the scene of the murder on foot with a sweatshirt wrapped around something.[15] Tucker entered 3355 Seymour Avenue, changed his clothes, and told Jones to "get rid of that thing," meaning a nine millimeter caliber handgun that had been placed beneath

---

[12]  *See id.* at 188-189 (testimony of Jones).

[13]  *See id.* at 664-665 (testimony of Matthew).

[14]  *See id.* at 775 (testimony of Detective Katherine Clements, stating that she recovered thirteen shell casings from the murder site); *id.* at 836-837 (testimony of Detective Kevin Barry, stating that he found that the thirteen casings were fired from the same gun).

[15]  *See id.* at 191 (testimony of Jones, stating that Tucker had "his sweatshirt wrapped around his hand close to his stomach"); *id.* at 527 (testimony of Curry, stating that the barrel of what appeared to be a shotgun was protruding from the sweatshirt).

4

Jones's mattress.[16] He also told Jones to determine whether there were police in the area. Jones determined that the handgun under his mattress was the same one he had seen when the conspirators decided to murder Scott.[17] Whitehead later called Jones to reiterate that he should dispose of the handgun; Jones told Whitehead that he had thrown the gun into a sewage drain, when in fact he kept the gun for himself.[18]

Whitehead later told B. Jones in detail how he and Tucker had murdered Scott. He explained "[h]ow they got in the van looking for [Scott], went up towards Hicks and Seymour . . . . They stopped a distance away, [Tucker] got out of the van and crept up towards him. Then he did his thing."[19]

Jones had two conversations with Tucker about the murder. First, Jones asked Tucker if it had been necessary to kill Scott, and Tucker responded that it was because Scott had robbed them.[20] Second, Jones asked Tucker how the murder was committed, and Tucker responded, "I caught the guy, and I lit him up,

---

[16]   *Id.* at 193 (testimony of Jones).

[17]   *See id.* at 195 (testimony of Jones).

[18]   *See id.* at 197-199 (testimony of Jones).

[19]   *Id.* at 527-528 (testimony of Curry).

[20]   *See id.* at 203-204 (testimony of Jones).

pow, pow, pow, just like that."[21]

Jones told the police what occurred.[22] Based on this information, the police obtained a search warrant for 3355 Seymour Avenue and recovered crack cocaine, drug paraphernalia, and documents belonging to Tucker, including his birth certificate and social security card.[23] When the search warrant was executed, Tucker was found sitting on the front steps of the building.

### B. The Indictment and Trial

Tucker was indicted for five counts: participating in a conspiracy to distribute and possess with intent to distribute cocaine base in violation of sections 846 and 841(b)(1)(A) of Title 21 of the United States Code (Count One); possession with intent to distribute five grams or more of cocaine base in violation of section 841(b)(1)(B) of Title 21 (Count Two); murder of Scott through the discharge of a firearm in violation of sections 924(j) and 2 of Title 18 of the United States Code (Count Three); possession of a firearm in furtherance of the narcotics conspiracy charged in Count One in violation of sections 924(c) and 2 of Title 18 (Count Four); and causing the intentional killing of Scott while engaged

---

[21] *Id.* at 204 (testimony of Jones).

[22] *See id.* at 211-213 (testimony of Jones); *id.* at 320-321 (testimony of Detective Grant).

[23] *See id.* at 345-347, 372-373 (testimony of Grant).

in the narcotics conspiracy charged in Count One in violation of section 848(e)(1)(A) of Title 21 and section 2 of Title 18 (Count Five).

A jury trial was held from January 28 through February 6, 2008. The jury convicted Tucker of Counts One, Two, Four, and Five, and acquitted him of Count Three. Tucker now moves for a judgment of acquittal on Count Two pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the ground that the evidence was insufficient to support the convictions; for a new trial on all counts because the jury's verdict was against the weight of the evidence; and that the verdict as to Counts Four and Five should be set aside on the ground of inconsistency with the acquittal on Count Three.[24]

## III. APPLICABLE LAW

### A. Sufficiency of the Evidence

To prevail on a motion for a judgment of acquittal under Rule 29, a

---

[24] Tucker concedes that current and historical Supreme Court precedent forecloses this last argument. *See* 5/2/08 Letter from George Goltzer, Attorney for Tucker, to the Court ("Def. Mem.") at 1-2; *Dunn v. United States*, 284 U.S. 390, 393 (1932) (Holmes, J.) ("Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment."); *United States v. Powell*, 469 U.S. 57, 65 (1984) ("For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.") (citing *Dunn*, 284 U.S. at 393). I therefore do not consider it further.

defendant must show that "the evidence is insufficient to sustain a conviction."[25] "'A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'"[26] The test established by the Supreme Court requires a court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[27] "But at the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'"[28] In evaluating the sufficiency of the evidence, the court must "view the evidence in the light most favorable to the Government, drawing all permissible inferences in the government's favor."[29] Where the government attempts to prove a fact that is also an element of the charged offense by

---

[25] Fed. R. Crim. P. 29(a).

[26] *United States v. Lorenzo*, No. 07 Cr. 1435, — F.3d —, slip op. 3065, 3075 (2d Cir. July 18, 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)).

[27] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[28] *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

[29] *Friedman*, 300 F.3d at 123.

8

circumstantial evidence, a court must be "satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt."[30]

B.  The Weight of the Evidence

Rule 33 authorizes a district court to grant a new trial "if the interest of justice so requires."[31] In exercising the broad discretion conferred under Rule 33, a court may weigh the evidence and assess the credibility of witnesses.[32] However, "'[b]ecause the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'"[33] "[O]n a Rule 33 motion to vacate, "[t]he 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice.'"[34] "For a trial judge to grant a Rule 33 motion, [the judge]

---

[30]  *United States v. Rodriguez*, 392 F.3d 539, 547 (2d Cir. 2004) (quotation marks and citations omitted).

[31]  Fed. R. Crim. P. 33(a).

[32]  *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

[33]  *United States v. Thompson*, 528 F.3d 110, 120 (2d Cir. 2008) (quoting *United States v. Ferguson*, 246 F.3d 129, 133-134 (2d Cir. 2001)).

[34]  *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

must harbor 'a real concern that an innocent person may have been convicted.'"[35]

## IV. DISCUSSION

### A. Dismissal of Count Two

"[C]onstructive possession . . . exists when [the] defendant 'knowingly has the power and the intention at a given time to exercise dominion and control over [the narcotics], either directly or through others.'"[36] Tucker argues that there is "absolutely no evidence . . . demonstrating that Tucker had actual or constructive possession of five or more grams of crack . . . ."[37] Tucker's contention is belied by the record. As discussed above, the Government introduced substantial evidence of the existence of a narcotics distribution organization at 3355 Seymour Avenue and of Tucker's participation in the activities of the organization. Jones and Curry testified that Tucker was aware of the narcotics kept in 3355 Seymour Avenue and took various steps to ensure the

---

[35] *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (quoting *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007)).

[36] *United States v. Richards*, 302 F.3d 58, 68 (2d Cir. 2002) (quoting *United States v. Gordils*, 982 F.2d 64, 71 (2d Cir. 1992)). The jury was instructed that "a person need not have actual physical custody of an object in order to be in legal possession of it. If an individual has the ability to exercise substantial control over an object that he does not have in his physical custody, then he is in possession of that item." Tr. at 1053.

[37] Def. Mem. at 8.

10

safety of the handlers of the narcotics.[38] Tucker's personal documents, including his birth certificate and social security card, were found at that location.[39] Additionally, Tucker's telephone records demonstrate that he frequently communicated with the other members of the narcotics conspiracy. A rational jury could conclude beyond a reasonable doubt that Tucker had both the ability to exercise dominion and control over the narcotics in 3355 Seymour Avenue and the intention to do so. Alternatively, they could determine that Tucker aided and abetted others in the possession of narcotics.[40]

## B. Weight of the Evidence

Three witnesses implicated Tucker in these crimes. He now argues that "the court should evaluate the credibility of the witnesses and find that the jury simply got it so wrong that there is a real danger of manifest injustice and the

---

[38] *See, e.g.,* Tr. at 474 (testimony of Curry, stating that Tucker and other enforcers would be in the vicinity during narcotics transactions so they could "see who was out there, they knew who was who and they wouldn't try anything funny").

[39] The documents were found along with a letter from his mother instructing him to keep them in a safe place. *See id.* at 345-347 (testimony of Grant).

[40] The jury was instructed as to aiding and abetting liability. *See id.* at 1105-1107.

11

conviction of an innocent man of a murder he did not commit."[41]

Three witnesses connected Tucker to the murder. Tucker argues that the testimony of each witness was contradictory and implausible. *First*, Tucker contends that it "is inherently incredible and not possible" that Matthew could have witnessed the shooting and recognized the victim from six hundred feet away.[42] *Second*, Tucker argues that Curry's testimony as to Tucker's involvement in the murder, as related by Whitehead, should be disregarded. Curry testified that Whitehead claimed Tucker crept out of the van and snuck up on Scott, but this is clearly inconsistent with the weight of the evidence. *Third*, Tucker maintains that Jones was so thoroughly impeached that his testimony is unreliable. Tucker argues that Jones asserted that he rode a bicycle to the crime scene but told the police he walked; he told unrelated lies to the police; he lied to obtain government benefits; he lied during proffer sessions; and lied about his knowledge of Tucker's criminal history.

As discussed above, courts should evaluate credibility only in unusual circumstances. Even assuming that this case does present such circumstances, however, I find that a reasonable jury could rationally base a conviction on the

---

[41] Def. Mem. at 8.

[42] *Id.* at 9.

12

testimony of the witnesses in this case and on the other available evidence. Tucker is correct that there are numerous contradictions in the witnesses' testimony. But this is not unusual; it would be both surprising and suspicious if two people gave entirely consistent detailed accounts of events that occurred several years ago. Even disregarding the evidence whose persuasive force is weakened by contradiction, there is sufficient unimpeached testimony and evidence to support a conviction. The critical elements of each witness's testimony were corroborated by the testimony of the other witnesses and by physical evidence.[43] The jury could reasonably have found that the mistakes made by the witnesses fall squarely within the realm of inadvertent error rather than deliberate falsehood, that the witnesses were otherwise credible, and that the testimony as to Tucker's involvement in the murder was accurate and, together with the other evidence, demonstrated his guilt beyond a reasonable doubt.

## V. CONCLUSION

For the reasons stated above, these motions are denied. Tucker's sentence is scheduled for Friday, September 26, 2008, at 4:30 p.m.

---

[43] *See United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003) ("Any lack of corroboration for [one witness's] testimony or any conflicting testimony was a matter to be argued to the jury, not a ground for reversal on appeal.").

13

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
August 13, 2008

## - Appearances -

**For the Government:**

Alexander J. Willscher
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-0084

**For Defendant:**

George R. Goltzer, Esq.
200 W. 57th St., Suite 900
New York, NY 10019

James Brian LeBow, Sr., Esq.
488 Madison Avenue, Suite 1100
New York, NY 10022
(212) 868-3311